UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------- x
                                                  :
MITCHELL RAKOFF, *pro se,*                        :
                                                  :          **_Opinion and Order_**
                           Plaintiff,             :
                                                  :          **05-cv-2862 (DLI)**
            -against-                             :
                                                  :
MICHAEL J. ASTRUE,[1]  Commissioner,  :
Social Security Administration,                   :
                                                  :
                           Defendant.             :
                                                  :
-------------------------------------------------- x

**DORA L. IRIZARRY, U.S. District Judge:**

Plaintiff Mitchell Rakoff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3),

to appeal the final decision of the Commissioner of the Social Security Administration

("Commissioner"), which found him ineligible to receive disability insurance and Supplemental

Security Income ("SSI") under Titles II and XVI of the Social Security Act (the "Act") prior to

July 1, 1983. The Commissioner moves for judgment on the pleadings pursuant to Fed. R. Civ.

P. 12(c). For the reasons set forth below, the motion is granted and the Commissioner's final

decision is affirmed.

**I.     Background**

**A.     Procedural History**

This case concerns Rakoff's eligibility to receive disability insurance and SSI benefits over

a four-year period from July 1979 to June 1983. The administrative record ("A.R.") shows that

the Social Security Administration ("SSA") has thrice reviewed his applications for benefits for

the said period and has thrice determined that he was not eligible. Rakoff first applied for

---

[1]        Pursuant to Fed. R. Civ. P. 25(d), Michael J. Astrue shall be substituted for
Commissioner Jo Anne B. Barnhart as the defendant in this action.

benefits on April 2, 1982 claiming total disability from June 1976 due to "psychiatric problems." (A.R. 329-50) The application was denied by the SSA on June 28, 1982. (A.R. 311-13) He reapplied for benefits on July 6, 1983 alleging disability beginning in 1968. This application was initially denied in its entirety by the SSA, but after several appeals including an appeal to and remand from this district court, SSA determined that Rakoff was disabled only from June 15, 1983 to February 28, 1986. (A.R. 36, 172-74). He filed another application for disability benefits in 1987 alleging that he was disabled from August 1986 onward. (A.R. 36, 182-85). This application did not claim benefits prior to July 1983, and was eventually granted on October 31, 1988. The ALJ in that decision found Rakoff had anxiety and personality disorders severe enough to meet the Commissioner's listed impairments. Plaintiff currently receives disability SSI benefits.

Following the settlement of the class action in *Stieberger v. Sullivan*, 81 F.Supp.1079 (S.D.N.Y. 1992), Rakoff requested on August 17, 1993 to reopen his April 2, 1982 application for benefits pursuant to the *Stieberger* settlement agreement.[2] Under the settlement, Rakoff can claim that he was disabled in the 48 months leading up to the first date of his eligibility for SSI. *See Stieberger*, 801 F.Supp. at 1091; Program Operations Manual DI §§ 42586.001(A)(7) & 12586.035(C)(1). Since he was previously found to have been disabled from June 1983 onwards, the relevant *Stieberger* development period in this case is the four years from July 1979 to July

---

[2] The *Stieberger* settlement permitted claimants who met the following criteria to reopen SSA claims: "(a) The class member had a disability claim denied or terminated between October 1, 1981, and . . . [July 2, 1992] on the ground that the class member was not, or was no longer, disabled . . . ; and (b) The class member was a New York State resident at the time of the denial or termination; and (c) The class member had a disability claim denied or terminated, (i) at any level of administrative review between October 1, 1981 and October 17, 1985; or (ii) at the ALJ [Administrative Law Judge] or Appeals Council level between October 18, 1985 and [July 2, 1992], inclusive." *Pizzo v. Barnhart*, 325 F.Supp.2d 438, 440 (S.D.N.Y. 2004) (citing *Stieberger v. Sullivan*, 801 F.Supp. 1079, 1086 (S.D.N.Y.1992)).

1983 ("the *Stieberger* period").[3]  SSA reopened and reviewed for the third time Rakoff's claim of disability prior to July 1983 and, on October 1, 2001, after *de novo* review, found the initial determination to be correct.  (Tr. 323-27).  Rakoff then requested a hearing before an Administrative Law Judge ("ALJ").  After a hearing was held, ALJ David Z. Nisnewitz determined on July 24, 2003 that Rakoff was not disabled prior to July 1983. (A.R. 16-24).  This decision became final when the Appeals Board denied review on April 7, 2005.  (A.R. 9-11). Plaintiff filed timely appeal of the decision in this court on June 3, 2005 pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

The question presented to the court is whether substantial evidence supports the Commissioner's final decision that plaintiff Rakoff was not disabled during the *Stieberger* period.

### B.    Factual Background

#### 1.    Relevant Medical History

Mitchell Rakoff was born in 1954, and first received treatment for psychological and emotional problems at the age of six.  (A.R. 112)  In 1968, he was hospitalized for six weeks at St. Vincent's Hospital in New York, where he was diagnosed with having a "schizophrenic reaction with obsessive-compulsive features." (A.R. 117)  From 1969 to 1973, he was treated by psychiatrist Dr. Peter Howland. (A.R. 86, 118, 146)  In October 1973, Dr. Howland wrote a letter to the Selective Service System stating that Rakoff was unfit for military service due to his psychiatric condition.  Dr. Howland noted that while Rakoff "made good progress with improved

---

[3]    If a claimant is found not disabled during the development period, but the claimant alleges that his impairment was more severe in an even earlier period, the SSA may have to develop the record back to the date of the onset of disability.  *Stieberger*, 801 F.Supp. at 1091; Program Operations Manual DI § 12586.035(C)(1).  In this case, the plaintiff has not alleged that his impairment was more serious prior to July 1979.

thinking, decreased ritualistic behavior and decreased anxiety," he still required "regular psychotherapy and psychotropic medication." (A.R. 118) This is the last recorded treatment plaintiff received until 1981.

The Administrative Record contains two medical reports from the *Stieberger* period: a conclusion note from three social workers at the Long Island Jewish Medical Center, where Rakoff received treatment in the fall of 1981, and a report from Dr. Joseph Benezara, who conducted a consulting examination of plaintiff in May 1982. In conducting *de novo* review of the Commissioner's final decision, the court also considered several medical reports that were prepared shortly after the *Stieberger* period ended in June 1983.

### a.   Long Island Jewish Medical Center Report

For five weeks in the fall of 1981, Rakoff attended weekly therapy sessions at the adult outpatient department of the Long Island Jewish-Hillside Medical Center. (A.R. 141). His treatment was documented in a conclusion note signed by three social workers in April 1982. (A.R. 139-42).

He was 27 years old and living with his mother or girlfriend at the time. The social workers found him to be loquacious and documented his "thought disorders," which were manifested through "poor reality testing, being illogical, [having] delusions of grandeur . . . and disorganization." (A.R. 140). He claimed that he needed "to have someone with him at all times in order to let him know whether he has done everything the way he should" and that such compulsive ritualized behavior practically immobilized him. (A.R. 140, 141) He also felt grandiose and above the law and became "enraged" when others did not cooperate. (*Id*.) Rakoff also had relationship problems with his girlfriend and legal problems with credit cards and the telephone company. (A.R. 140)

The social workers treated him for compulsive personality disorder, and could not rule out chronic paranoid schizophrenia. They described him as not very motivated to deal with his problems. (A.R. 140) He skipped many treatment sessions and made few gains. (A.R. 141) For example, he agreed to get rid of certain credit cards but only those he could no longer use. The social workers suspected the reason he sought treatment was to mitigate his legal troubles. He was involved in fraud and rip-offs involving credit cards. He was "quite happy to con the therapist [but] somewhat disappointed when he unable to." (*Id*.) He broke off the therapy sessions after five weeks, claiming to be seeking treatment elsewhere. In their conclusion, the social workers found Rakoff's condition unchanged and gave a guarded prognosis. They also warned that should he return for more treatment, "his motivation should certainly be explored" because he "tends to use therapy at and for his convenience and not really invest himself in the process." (A.R. 142)

### b. Dr. Benezara Report

After applying for disability benefits in April 1982, Rakoff was interviewed by Dr. Joseph Benezara on May 15, 1982. (A.R. 369-71) Dr. Benezara diagnosed him with "[s]evere obsessional neurosis" and the likely presence of "a residual schizophrenia with paranoid concerns." (A.R. 371)

Dr. Benezara found Rakoff to have normal cognitive capacities and to be helpful, cooperative and responsive throughout the interview. (A.R. 370) Rakoff's speech, he noted, was "generally relevant, logical, and coherent." (*Id*.) Rakoff was alert, showed average concentration and fund of general information, and had unimpaired judgment. (*Id*.)

Rakoff told Dr. Benezara that he cannot sit still, cannot take instruction and becomes easily provoked into anger and violence. (A.R. 369) Dr. Benezara described some of Rakoff's

psychological impairments caused by obsessions and compulsions, including "some minor persecutory delusions" that his telephone line was being tapped and other people were spying on him. (*Id*.) Rakoff had to check things multiple times such as "return[ing] to his door numerous times within an hour to check that the screws on the door are tightened properly." *(*A.R. 369-70) He would become violent if unable to check them. (A.R. 369) Rakoff reported having a few friends with whom he dealt with on "a superficial level" but also suspected them of wishing him harm.

Dr. Benezara believed Rakoff could probably "perform usual household chores or shop in the neighborhood," and manage his own funds. (A.R. 370, 371) He also stated that "some limitations in Rakoff's personal and social life . . . would make [it] hard for him to accept any . . . task or supervision or customary work pressure for any period of time." (A.R. 371) He concluded that while therapy and medication could improve Rakoff's condition, he did not "expect any significant restoration of function even with the best of treatments." (*Id*.)

### c.     Dr. Quinones Report

Shortly after Rakoff applied for disability benefits in July 6, 1983, he was examined by consulting physician Dr. Matthew Quinones on July 29, 1983. (A.R. 122-124) Dr. Quinones diagnosed him with "atypical exacerbation of psychosis", major depression following death of his mother, a borderline personality, and obesity. (A.R. 123)

Dr. Quinones found Rakoff to be cooperative and unremarkable. (A.R. 122) Rakoff gave coherent and relevant responses and demonstrated "high average" intelligence and adequate general fund of information. (A.R. 122, 123) He reported having a girlfriend, a few friends, and occasionally saw relatives. (A.R. 123) Dr. Quinones opined that Rakoff could care for his personal needs, do household chores, and manage his funds.

Dr. Quinones characterized Rakoff's mood as depressed, concentration as "somewhat poor" and attention span as "somewhat short."  (A.R. 122)  Rakoff reported hearing voices of his mother after her death the month before, and feeling afraid at night. (*Id.*)  Dr. Quinones recommended a resumption of therapy, preferably at the outpatient clinic of the Long Island Jewish Medical Center, since he had been treated there before.  Dr. Quinones gave a "guarded to fair" prognosis.  (A.R. 123)

### d.    Dr. Head Reports

On October 7, 1983, Rakoff sought a consultative examination with Dr. William Head, a psychiatrist, who then treated his mental health problems until at least March 1985.  Dr. Head diagnosed Rakoff with having an obsessive compulsive personality disorder.  (A.R. 149)  The administrative record contains two detailed reports from Dr. Head on Rakoff's conditions, the first on February 15, 1984 (A.R. 144-151) and the second on March 26, 1985 (A.R. 268-272).

The February 15, 1984 report was prepared for Rakoff's attorney in conjunction with his application for Social Security benefits.  Dr. Head found Rakoff to be alert and oriented with "memory concentration with comprehension in tact."  (A.R. 148)  He described Rakoff as intelligent and resourceful but also anxious and depressed.  (A.R. 145, 148)  Though Rakoff told him stories of hearing voices, Dr. Head found "no evidence of any delusions, hallucinations. . . looseness of associations [or] psychosematic disturbances."  (A.R. 148)  Dr. Head characterized Rakoff's psychological problem as obsessive compulsive thinking and activity, evidenced in his phobias for germs, denting his car, and being apart from his girlfriend.  (*Id.*).  Rakoff's "personality is his pathology, not some emotional difficulty or inability to think clearly" Dr. Head wrote.  (A.R. 149)  As soon as Rakoff had "a thought in mind about some particular subject . . . he finds that he can think of nothing else, his other responsibilities, his need for social

interaction with others, his involvement in the day to day activity of friends and acquaintances is thrown aside for a specific thought that he must spend time with." (A.R. 145) As examples, Dr. Head recounted Rakoff's descriptions of how he would compulsively count potholes when driving, spend whole mornings looking for loose change behind a seat, and write down everything that could possibly affect him during the course of the day on a single sheet of paper. (A.R. 145) Dr. Head also noted that Rakoff had trouble being alone and depended heavily on his girlfriend "to provide guidance and help and in a sense the personality and maturity that he lacks." (A.R. 147)

Dr. Head also described Rakoff's fraudulent use of credit cards under alias names, which reached total amounts of two to three hundred thousand dollars. (A.R. 147) Rakoff was arrested and served "a good deal of probation." (*Id*.) According to Dr. Head, Rakoff stopped immediately his credit card using activities and thereafter "attempted to be as honest in his dealings with others as possible." (*Id*.) Dr. Head believed that Rakoff had "almost leaned over into the opposite direction in trying to do 'everything right.'" (*Id*.)

As for Rakoff's mental health problems, Dr. Head gave a "terrible prognosis" and said it would require intensive psychotherapy, which he offered to provide for free. (A.R. 150). He opined that Rakoff's condition met the regulatory listing requirement setting forth disability from non-psychotic emotional disorders. (*Id*.) He believed that the compulsive personality disorder rendered Rakoff "essentially incapable of maintaining gainful or regular employment with any employer whatsoever." (A.R. 150) While describing Rakoff as capable of performing "simple tasks, complex tasks, repetitive tasks, and varied tasks without difficulty," Dr. Head felt his patient would have difficulty holding jobs because of difficulties in submitting to authority and getting along with peers. (A.R. 151) This left Rakoff's "chances of maintaining gainful

employment are variable between extremely unlikely to absolutely impossible." (*Id*.)  Dr. Head added that Rakoff's "degree of restriction to his home in the absence of [his girlfriend] to help him leave the house is virtually complete and severe." (*Id*.)  Dr. Head also believed Rakoff's level of pathology had persisted "for at least two years" and would continue for a year, regardless of the amount of therapy or intensive care he receives.  (*Id*.)

Dr. Head prepared the March 26, 1985 report in response to Rakoff's arrest for attempting to sell indecent materials to a minor. (A.R. 268)  Dr. Head indicated that his initial assessment of Rakoff's impairment as obsessive compulsive personality disorder was largely accurate. (A.R. 269)  He felt that Rakoff was not dangerous and violent, except when he occasionally slapped his girlfriend. (*Id*.)  He noted with regret that the arrest took place just as his patient "seemed to be getting his life together and establishing himself as an electronics technician."  (*Id*.)  He related that Rakoff's "recent employment history ha[d] been good" and that [Rakoff] ha[d] been able to get along well with his supervisors and co-workers," and expressed confidence that Rakoff's compulsiveness and sociopathic traits could be lessened with psychotherapy (A.R. 270)  Dr. Head gave an optimistic prognosis because Rakoff was within the framework to "becom[ing] a useful and productive member of society" and "on the road to recovery" (A.R. 271) He recommended that Rakoff be given probation. (*Id*.)

### 3.    Education History

Rakoff attended a residential high school for disabled children from 1968 to 1972.  He withdrew from public school because of a "total inability to cope with traditional academic programs and failure to relate to his peers." (A.R. 113, 116)  At the residential school he received intensive psychotherapy and the "flexibility of programs as well as the structure and guidance necessary to promote positive overall growth." (A.R. 113)  After graduating from high school, he

attended the RCA Technical Career Institute, where he received an associate's degree in technology. (A.R. 425) He then studied engineering at the Pratt Institute before dropping out after a year. (*Id.*) He obtained a diploma as an electronic technician from the Cleveland Institute of Electronics, by studying through correspondence from his home in New York. (A.R. 425-26) He obtained a HAM radio license and has an FCC license to operate ship radar. (A.R. 464-65)

### 4. Employment History

According to Federal Insurance Contributions Act ("FICA") records, Rakoff earned no income from 1978 through 1983. (A.R. 160) The FICA records show that he had earnings sufficient to constitute substantial gainful activity from 1974 to 1977 and from 1984 to 1985, but none since 1986. (*Id.*) Despite the lack of recorded FICA earnings in the *Stieberger* period, Rakoff reported having periodic work in this timeframe. In his 1983 application for SSI, he reported working from June to September 1980 as a technician for CBS Management, earning $160 per week. He also worked as a video equipment operator from December 1981 to March 1982 for Microband Corp., earning five dollars per hour for 16 hours per week. (A.R. 93) He was laid off due to lack of business. At the time of his application, dated December 27, 1983, he reported that he had been doing maintenance work for MSR Electronics since July 1982, working seven days a week and earning $175 per month. (*Id.*) In his 2001 application, he reported working as a video equipment operator from June 1981 to June 1983 working 16 hours per week and earning five dollars an hour. (A.R. 353) He also reported having a job as a Panasonic electronics repair person from March 1983 to July 1984, in which he worked 40 hour-weeks and earning $10 per hour. (A.R. 353) The job was located in Paramus, New Jersey, and Rakoff said he eventually quit the job because he did not like to commute through heavy traffic. (A.R. 429) His last job was in broadcasting from July 1984 to September 1986, earning $14.00

per hour working varied hours.

### 5. Plaintiff's other statements

In his 1983 application, he indicated that he drove a car and used driving as a therapy to allow him to unwind. (A.R. 86) He also drove to his weekly therapy sessions with Dr. Head in Staten Island. (A.R. 439) Rakoff also reported having been incarcerated in federal and local facilities in 1983, 1993 and 1997 as a result of felony convictions. (A.R. 362)

## II. Discussion

### A. Standard of Review

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. Pro. 12(c). The Act authorizes the district court to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In this case, the court considers the Rule 12(c) motion within the scope of judicial review under the Act.

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of the notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. § 405(g). This action was timely filed on June 3, 2005, within 60 days of the Commissioner's final decision on April 7, 2005.

A district court, reviewing the final decision of the Commissioner, must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *See Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998). The former determination

requires the court to ask whether "the claim has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (internal quotations omitted). The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

A remand by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004). A remand to the Commissioner is also appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)). ALJs, unlike judges, have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999).

### B. Disability Claims

To receive disability benefits, a claimant must be "disabled" within the meaning of the Act. *See* 42 U.S.C. §§ 423(a)&(d). Claimants establish disability status by demonstrating an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 423(d)(1)(A). The claimants bears the initial burden of proof on disability status and is required to demonstrate disability status by presenting "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic

techniques," as well as any other evidence the Commissioner may require. 42 U.S.C. § 423(d)(5)(A); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

The ALJ must adhere to a five-step inquiry to determine whether a claimant is disabled under the Social Security Act as set forth in 20 C.F.R. § 404.1520.  *See also* 20 C.F.R. § 416.920 (setting forth the same five-step inquiry to evaluate disability of adults).  If at any step, the ALJ makes a finding that the claimant is either disabled or not disabled, the inquiry ends there.  First, the claimant is not disabled if he or she is working and performing "substantial gainful activity." 20 C.F.R. § 404.1520(b).  Second, the ALJ considers whether the claimant has a severe impairment, without reference to age, education, or work experience.  To be considered disabled, the claimant must have an impairment, or combination of impairments, which significantly limits his or her physical or mental ability to do basic work activities, and satisfy durational requirements in § 404.1509. 20 C.F.R. § 404.1520(c).  Third, the ALJ will find the claimant disabled if his or her impairment meets or equals the impairment listed in Appendix 1 of 20 C.F.R., Part 404, Subpart P ("Appendix 1"). 20 C.F.R. § 404.1520(d).

If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's "residual functional capacity" in steps four and five.  20 C.F.R. § 404.1520(e).  The "residual functional capacity" is "the most [the claimant] can still do despite . . . limitations." 20 C.F.R. 404.1545(a)(1).  The ALJ considers all of the claimant's impairments and symptoms, including pain, that may cause physical or mental limitations.  *Id.*  In the fourth step, the claimant is not disabled if he or she is able to perform "past relevant work." 20 C.F.R. § 404.1520(e). Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work which exists in the national economy, considering factors such as age, education, and work

experience. If so, the claimant is not disabled. 20 C.F.R. § 404.1520(f). At this fifth step, the burden shifts to the Commissioner to demonstrate that the claimant could perform other work. *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)(citing *Carroll*, 705 F.2d at 642).

### C.    Decision of the ALJ

The ALJ examined whether plaintiff was disabled during the *Stieberger* development period. Rakoff alleged that he had become disabled in June 1974 due to obsessive-compulsive disorder, a sciatic nerve condition, and an inability to walk or stand for significant periods of time. (A.R. 20)

ALJ Nisnewitz evaluated plaintiff's claim using the five-step regulatory test outlined above. At step one, the ALJ found that though the Rakoff did sporadic work after the onset of his disability, there was "no proof plaintiff engaged in substantial gainful activity." (A.R.20, 23). At step two, the ALJ determined that plaintiff's disability was purely a mental impairment with no physical conditions, but the mental impairment was severe enough to limit his ability to function during the relevant period. (A.R. 21). The ALJ considered Rakoff's assertion that he could not walk for more than a block without pain. The ALJ found no evidence of physical impairment that limited his ability to function or any ongoing treatment of his self-professed ailments. At step three, the ALJ found that Rakoff's mental impairment was not severe enough to meet or medically equal one of the listed impairments in Appendix 1 because he was able to care for his own needs, perform the activities of daily living, interact with friends and relatives and was able to concentrate and perform activities that did not involve a great deal of stress. (A.R. 21).

Then at step four, the ALJ considered whether Rakoff had the residual functional capacity to perform past relevant work during the *Stieberger* period. In finding that he did, the ALJ cited

Benezara's report from May 1982, which states that Rakoff had coherent and logical speech, average concentration, general fund of information and unimpaired judgment. The ALJ also reiterated Rakoff's ability to travel, interact with others, care for himself, and perform non-stressful work, in concluding that he could perform simple, repetitive work. No treating source concluded that Rakoff was disabled during the *Stieberger* period. Finally, the ALJ held that Rakoff could have performed relevant work as an electronics technician during the *Stieberger* period and noted that he did so after July 1983.

Hence, the ALJ concluded that Plaintiff was not disabled before July 1983.

**D.     Analysis**

After carefully reviewing the administrative record, the court finds that the Commissioner's final determination is based on correct legal standards and supported by substantial evidence. The relevant evidence shows that Rakoff's condition during the *Stieberger* period did not meet the listing requirement to be considered *per se* disabled, that he retained functional capacity to do work and, as the ALJ determined, could have returned to do prior relevant work. Therefore, Rakoff was not disabled during the *Stieberger* period.

In his appeal, Rakoff suggests that, since he had already been found to be disabled with obsessive compulsive disorder in 1987 and because the disorder was either "genetically induced at birth" or acquired as a result of deep trauma in one['s] life," he ought to have been found disabled at a much earlier point in his life. (*Pro se* Pl.'s brief, (ECF Dkt. No. 14) at 1) However, obsessive-compulsive disorder is not itself a listed condition that automatically qualifies a claimant as being disabled. Evidence from the record shows that his condition in the *Stieberger* period does not support a finding of disability.

First, the ALJ's determination at step three of the five-step test was substantiated by the

evidence in the record; Rakoff's condition did not meet the listing requirements. In prior proceedings, Rakoff's condition was classified as an anxiety-related disorder under Section 12.06 of Appendix 1 and a personality disorder under Section 12.08. Appendix 1 organizes the listed impairments into different classes, each with specific criteria that a claimant's condition must satisfy to be considered *per se* disabling. 20 C.F.R., Pt. 404, Subpt. P, App.1.

Section 12.06 requires that a claimant with anxiety disorder must show at least one of the medical symptoms of the disorder set forth in Category A and at least two functional limitations resulting from the disorder set forth in Category B.[4] Instead of meeting the Category B criteria, a claimant may instead satisfy Category C, which requires the showing of a "complete inability to function independently outside the area of one's home". Section 12.08 requires that a claimant with personality disorder must show at least one of the "[d]eeply ingrained, maladaptive patterns of behavior" set forth in Category A and at least two of the functional limitations set forth in Category B.[5] The Category B criteria for both disorders are identical. A claimant must show that

---

[4] The list of symptoms set forth in Category A of Section 12.06A are as follows:
1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
    a. Motor tension; or
    b. Autonomic hyperactivity; or
    c. Apprehensive expectation; or
    d. Vigilance and scanning; or
2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or
3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or
4. Recurrent obsessions or compulsions which are a source of marked distress; or
5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress.
20 C.F.R., Pt. 404, Subpt. P, App.1, § 12.06.

[5] The "[d]eeply ingrained, maladaptive patterns of behavior" set forth in Category A of Section 12.08 are as follows:

the disorder resulted in at least two of the following functional limitations:

      1. Marked restriction of activities of daily living; or
      2. Marked difficulties in maintaining social functioning; or
      3. Marked difficulties in maintaining concentration, persistence, or pace; or
      4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R., Pt. 404, Subpt. P, App.1, §§ 12.06 & 12.08.

The ALJ did not explicitly cite the provisions of Sections 12.06 & 12.08 in his decision, but his findings make clear that Rakoff could not satisfy the Category B criteria. The ALJ found that Rakoff was able to care for his own needs, carry out the activities of daily living, socialize with friends and relatives, concentrate, and perform low-stress tasks. (A.R. 21). These findings are supported by substantial evidence in the record. 20 C.F.R., Pt. 404, Subpt. P, App.1, §§ 12.06 & 12.08.

The "[a]ctivities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for [the claimant's] grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R., Pt. 404, Subpt. P, App.1, § 12.00(C)(1). Despite Rakoff's claims of being utterly dependent on his mother and girlfriend for emotional support and guidance, both Dr. Benezara and Quinones found him capable of taking care of his personal needs and doing household chores. Rakoff, in his 1982 application for disability, also reported that he was able to clean and dine out. This evidence shows that he was able to care for himself.

"Social functioning refers to [the claimant's] capacity to interact independently,

---

      1. Seclusiveness or autistic thinking; or
      2. Pathologically inappropriate suspiciousness or hostility; or
      3. Oddities of thought, perception, speech and behavior; or
      4. Persistent disturbances of mood or affect; or
      5. Pathological dependence, passivity, or aggressivity; or
      6. Intense and unstable interpersonal relationships and impulsive and damaging behavior.

20 C.F.R., Pt. 404, Subpt. P, App.1, § 12.08.

appropriately, effectively, and on a sustained basis with other individuals. . . includ[ing] the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers." 20 C.F.R., Pt. 404, Subpt. P, App.1, § 12.00(C)(2). A claimant "may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation." *Id.* In his 1982 application, Rakoff also reported that he dined out and remained in contact with a small group of friends and relatives. He also reported holding a number of different jobs during the *Stieberger* period, which also demonstrates a significant degree of independent social interaction.

"Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R., Pt. 404, Subpt. P, App.1, § 12.00(C)(3). Major limitations in concentration can often be detected through clinical or psychological testing, including the use of intelligence or memory tests. *Id.* Dr. Benezara found Rakoff to have average concentration. Dr. Quinones characterized Rakoff's concentration as "somewhat poor" but also determined from a battery of psychological tests his intelligence was high average and memory was good. Dr. Head, who examined Rakoff well after the end of the *Stieberger* period, found Rakoff's memory concentration to be intact. The various medical reports all showed Rakoff to be alert, responsive, intelligent, knowledgeable and articulate. The reports of Doctors Quinones and Benezara also indicate that Rakoff could perform at least simple and repetitive tasks, which require a moderate degree of concentration. Dr. Head described Rakoff as capable of performing complex tasks without difficulty. The ALJ took into account non-medical factors like Rakoff's ability to drive, and self-reported work activity during this period. All of these facts support a finding that Rakoff had sufficient concentration to permit timely and appropriate

completion of tasks in a work setting.

"Episodes of decompensation" are defined as " exacerbations or temporary increases in symptoms or signs [of an impairment] accompanied by a loss of adaptive functioning" such as "difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R., Pt. 404, Subpt. P, App.1, §§ 12.00(C)(4). Such episodes "would ordinarily require increased treatment or a less stressful situation (or a combination of the two)" and may be inferred from "significant alteration in medication . . . hospitalizations, placement in a halfway house, or a highly structured and directing household. . . or other relevant information . . . about the existence, severity, and duration of the episode." *Id*. By "repeated episodes of decompensation, each of extended duration," the regulations require that a claimant must show at least "three episodes [of exacerbated symptoms] within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." *Id*. Aside from the notes of social workers at the Long Island Jewish Hospital, the record contains no other evidence that Rakoff received treatment during the *Stieberger* period. There is very limited medical documentation on the progression of his condition during this time. The death of his mother in June 1983 appears to have exacerbated his symptoms, but, even so, he falls well short of meeting any of the other three criteria in Category B.

Nor can he substitute Category C of Section 12.06. It is quite apparent from the record that he could function independently outside the home. Despite having mental distractions, Rakoff was able to drive to engagements, appointments and work. He also reported holding various electronics-related jobs during the period even though his FICA payroll reports show no earnings. These facts also support the ALJ's finding that Rakoff retained the residual capacity to work and could return to past relevant work.

In assessing a claimant's residual functional capacity at step four, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other requirements of past relevant work. 20 C.F.R. § 416.945(a). Past relevant work refers to work that the claimant performed in the 15 years prior to claiming disability and that lasted long enough for the claimant to acquire the skills to do the job and to constitute substantial gainful activity. 20 C.F.R. §§ 404.1565(a) & 404.960(b)(1). A claimant who can still perform past relevant work is not disabled, despite having a severe impairment. 20 C.F.R. §§ 416.920(f); 416.960(b)(3). There is no indication in the record to suggest that Rakoff had any physical or sensory limitations during the *Stieberger* period. Despite his mental impairments, the record shows that he was able to perform simple, repetitive non-stressful work, as the ALJ found. Rakoff was trained and licensed to operate and repair certain types of electronics equipment. He had substantial gainful activity as an electronics technician both before the *Stieberger* period in the mid-1970s and afterwards in the mid-1980s. Therefore, substantial evidence supports the ALJ's conclusion at step four that Rakoff retained the residential functional capacity to perform past relevant work.

The ALJ did not reference the medical reports by Dr. Head prepared February 1984 and March 1985. The ALJ stated that "no treating source concluded that [Rakoff] was disabled during the [*Stieberger*] period." (A.R. 22). This conclusion is accurate because Dr. Head did not examine and treat Rakoff until after the *Stieberger* period had ended. Moreover, the two reports by Dr. Head, when compared to each other and considered in light of the other evidence, do not alter the soundness of the ALJ's conclusions.

Dr. Head does state in the 1984 report that Rakoff had been severely disabled for the previous two years, but he did not have Rakoff's full record available to him as the ALJ did, and he was apparently not aware of the jobs that Rakoff reported having during the *Stieberger* period.

Several key conclusions backing his initial disability assessment were altered in the 1985 report. In 1984, Dr. Head doubted whether Rakoff could ever find work because of his inability to submit to supervision. But in the 1985 report, Dr. Head described Rakoff was holding a job and getting along well with associates at work. Though Dr. Head's overall diagnosis of Rakoff's personality-based disorder did not change from the two reports, his outlook for the patient swung noticeably from grim to upbeat from 1984 to 1985. This shows that the two-year retrospective assessment in the 1984 report may also have been unduly negative. After all, Dr. Head had not seen Rakoff in 1982 or in 1983 until the consultation in October. He was speculating on Rakoff's past as much as he was predicting Rakoff's future. On the whole, even taking into account the reports by Dr. Head, the court finds that there is still more than ample evidence in the record for a reasonable mind to accept as adequate the conclusion that Rakoff was not disabled from July 1979 to July 1983.

**VI.    Conclusion**

Accordingly, for the foregoing reasons, the Commissioner's motion for judgment on the pleadings is granted. The case is dismissed.

SO ORDERED.

Dated: Brooklyn, New York
        March 20, 2009

_____/s/_____
        DORA L. IRIZARRY
        United States District Judge